# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

ALL FUNDS ON DEPOSIT IN CITIBANK N.A.      Case Number: 18-MJ-1293
ACCOUNT ENDING IN 1793 HELD IN THE
NAME OF ROI PROPS JAX, LLC

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Richard Connors III, being duly sworn depose and say:

I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, and have reason to believe that in the Eastern District of Wisconsin there is now certain property, namely, all funds on deposit in CitiBank N.A. account ending in 1793 held in the name of ROI PROPS JAX, LLC, that is civilly forfeitable under 21 U.S.C. § 881(a)(6) and 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984, and criminally forfeitable under 21 U.S.C. § 853(a) and 18 U.S.C. § 982(a)(1), as property that (1) constitutes or is derived from proceeds of trafficking in controlled substances, or was used or intended to be used to facilitate the commission of a controlled substances offense, committed in violation of 21 U.S.C. § 841(a)(1), and (2) was involved in concealment money laundering transactions committed in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and which property is therefore also subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b) and 21 U.S.C. § 881(b), and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

The application is based on these facts:

     ✓ Continued on the attached sheet.
     ❏ Delayed notice of ____ days (give exact ending date if more than 30 days:_____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Signature of Affiant
Richard Connors III, SA, ATF

Sworn to before me, and subscribed in my presence

7/24/18 @ 1:30 p.m.
Date and time issued

at Milwaukee, Wisconsin
City and State

William E. Duffin, U.S. Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANTS

I, Richard Connors III, having been first duly sworn on oath, state that:

## Affiant's Background

1. I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) assigned to the Milwaukee Field Office since October of 2015. I have been employed as a full-time law enforcement officer for over two and one-half half years. I have received training at the Federal Law Enforcement Training Center in Glynco, Georgia. I attended the Criminal Investigator Training Program, as well as ATF's Special Agent Training Program. I have received training in the investigation of unlawful possession of firearms, the unlawful transfer of firearms, and the unlawful dealing in firearms without a dealer's license. Before becoming a Special Agent with the ATF, I received two bachelor's degrees from Northern Illinois University in the fields of Sociology and International Relations. I have received a Master's degree from Northern Illinois University in the field of American Government.

2. I have training and experience in investigating narcotics and firearms trafficking. As a law enforcement officer, I have authored many criminal complaints and search and seizure warrants, and I have participated in the execution of warrants, at which times narcotics, firearms, ammunition, records or receipts pertaining to such, and U.S. currency have been seized. I have debriefed defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations and firearms trafficking. I am familiar with narcotics traffickers' methods of operation including the distribution, storage, importation, and transportation of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering

3. I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by the law to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516.

4. The facts in this affidavit come from my training and experience as well as my personal participation in this investigation via (a) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; and (b) information obtained from cooperating citizen witnesses, confidential sources, and defendants.

5. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom I have had regular contact regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## Property Sought to be Seized

6. I submit this affidavit in support of an application for warrants to seize the following:

   a. All funds on deposit in CitiBank N.A. account ending in 4331, held in the name of Lev Reys; and

   b. All funds on deposit in the CitiBank N.A. account ending in 1793, held in the name of ROI PROPS JAX, LLC.

7. I further submit that the above-described funds:

   a. Constitute or are derived from proceeds of trafficking in controlled substances, or were used or intended to be used to facilitate the commission of a controlled substances offense, committed in violation of 21 U.S.C. § 841(a)(1), and therefore are:

      i  Subject to civil forfeiture under 21 U.S.C. § 881(a)(6) and 18 U.S.C. §§ 981(a)(1)(C) and 984;

      ii  Subject to criminal forfeiture under 21 U.S.C. § 853(a); and

      iii  Subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b) and 21 U.S.C. § 881(b), and via a criminal seizure warrant under 21 U.S.C. § 853(f).

   b. Were involved in concealment money laundering transactions committed in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), and therefore are:

      i  Subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A);

      ii  Subject to criminal forfeiture under 18 U.S.C. § 982(a)(1); and

      iii  Subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b) and via a criminal seizure warrant under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

8. Based on the facts set forth below, I submit that there exists probable cause to believe that:

   a. Between January 1, 2015, and December 31, 2017, at least $55,615 in suspected proceeds of marijuana sales were commingled with substantial proceeds derived from other, apparently legitimate, sources in CitiBank N.A. account ending in 4331, held in the name of Lev Reys ("CitiBank

4331"), for the purpose of concealing the nature and source of the proceeds, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 1956(a)(1)(B)(i);

    b.    $50,380.61 of the commingled proceeds in CitiBank 4331 were then transferred into CitiBank N.A. account ending in 1793, held in the name of ROI PROPS JAX, LLC ("CitiBank 1793"); and

    c.    The funds on deposit in CitiBank 4331 and CitiBank 1793 are therefore subject to civil forfeiture under 21 U.S.C. § 881(a)(6) and 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984, and subject to criminal forfeiture under 21 U.S.C. § 853(a) and 18 U.S.C. § 982(a)(1). I further submit that the funds are subject to civil seizure under 18 U.S.C. § 981(b) and 21 U.S.C. § 881(b) and to criminal seizure under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

    9.    Specifically, Lev Reys (1) obtained cash proceeds from his participation in an interstate marijuana trafficking operation, (2) attempted to disguise the cash drug proceeds by purchasing money orders in nominee names, (3) attempted to further disguise the nature and source of those funds by commingling those proceeds with a substantial amount of apparently legitimate funds in his personal bank account at CitiBank, N.A., and (4) attempted to further disguise the nature and source of those now commingled funds by establishing two business entities – ROI PROPS PIT, LLC and ROI PROPS JAX, LLC – and opening CitiBank, N.A. checking accounts in those business names and transferring portions of the commingled proceeds in his personal bank account into the two business bank accounts.

**Facts Supporting Findings of Probable Cause for Issuance of Seizure Warrants**

    10.    Based on my experience in investigating this and other cases involving the sale of illicit drugs, including marijuana, I know the following:

    a.    Manufacturers and distributors of illegal drugs typically have substantial profit margins on the sale of, and earn substantial amounts of profits from, the sale of illegal drugs.

    b.    Individuals involved in illegal sales of controlled substances or other unlawful activities often generate large amounts of criminal proceeds.

    c.    Individuals involved in the manufacture, distribution, and sale of illegal products, such as narcotics, often use a large amount of cash transactions to conduct business in an attempt to avoid detection and to finance their on-going business operations.

    d.    Individuals involved in illegal activities often attempt to place their ill-gotten proceeds into a financial institutions to use their attendant services

and integrate the illegal proceeds into the financial systems of the United States and foreign governments. Frequently, these individuals have some sort of legitimate income or funds, and comingle their illegal profits with their legitimate funds. This helps to conceal the illegal source.

11. In 2017, members of the Milwaukee Police Department initiated an investigation into a large-scale marijuana drug trafficking organization ("DTO") led by Josef K. Habib and others. Habib acquired large shipments of marijuana from out-of-state source(s), which Habib then distributed in the greater Milwaukee area. Habib was also identified as utilizing stash locations in the greater Milwaukee area, including in the cities of Milwaukee and Greenfield, Wisconsin.

12. On January 8, 2018, law enforcement was conducting surveillance at an identified stash location at 41XX W. Hillcrest Drive, apartment #2XX, in Greenfield and observed a vehicle known to be driven by Habib, a black Nissan Maxima, bearing Wisconsin license 242XXX, parked in a visitor parking stall at 41XX W. Hillcrest Drive, near the garage for apartment #2XX. The overhead garage door on the attached garage for apartment #2XX was fully open.

13. Law enforcement subsequently observed a Toyota Highlander vehicle bearing VA license plates arrive and drive into the open garage for apartment #2XX. The garage door then immediately closed.

14. Approximately 20 minutes later, law enforcement observed the overhead garage door open, and law enforcement observed a white male enter the driver's seat of the Toyota and Habib standing in front of the Toyota. The Toyota began to reverse out of the garage to apartment #2XX and drive from the area. Habib was then observed entering the Nissan Maxima and driving it into the garage for apartment #2XX, after which the overhead door closed.

15. Approximately 25 minutes later, the overhead door of the garage for apartment #2XX again opened, and the Nissan Maxima exited in reverse. Habib was observed to be the driver and sole occupant of the vehicle.

16. A traffic stop was conducted of the Nissan Maxima, driven by Habib, directly outside the address at 41XX W. Hillcrest Drive. At that time, an odor of marijuana was detected emanating from the vehicle and a large black plastic garbage bag was observed on the rear passenger seat. The black plastic garbage bag was consistent with what law enforcement knew during the investigation that Habib used to transport quantities of marijuana. A search of the garbage bag revealed foil sealed packages, each of which contained suspected marijuana.

17. A complete search of the Nissan Maxima revealed a total of approximately 64 pounds of suspected marijuana within the trunk and rear passenger area of the vehicle. A field test conducted on the suspected marijuana provided positive results for the presence of THC.

4

18. On January 8, 2018, a traffic stop was also conducted of the Toyota. A subsequent consent search was conducted, which revealed approximately 160 pounds of marijuana and in excess of $300,000 in U.S. currency.

19. Search warrants were subsequently executed on January 8, 2018 at 41XX W. Hillcrest Drive, apartment #2XX, Greenfield, Wisconsin, and at the residence of Habib, located at 1XX W. Walker Street, apartment #3XX, Milwaukee, Wisconsin.

20. Law enforcement located and seized approximately 206 pounds of marijuana from 41XX W. Hillcrest Drive, apartment #2XX, in Greenfield. Additionally, law enforcement located and seized approximately 16 pounds of marijuana, in excess of $21,500 in U.S. currency, and a loaded .40 caliber pistol from 1XX W. Walker Street, apartment #3XX, in Milwaukee. Also seized were items consistent with the packaging and distribution of controlled substances.

21. The majority of the marijuana seized was in Mylar bags and vacuum sealed bags, some within black plastic construction bags.

22. Rental documents obtained for the stash location at 41XX W. Hillcrest Drive revealed that it had been rented in 2017 by Fredric Birault, and an individual named Larry Peters was the contact name for Birault, with an email address of larryXXXXXXXXXX@gmail.com. Larry Peters was subsequently determined to be an alias name of Lev Reys and the email address larryXXXXXXXXXX@gmail.com was determined to be an email address for Lev Reys. The subscriber for utilities was Sydney Malkin.

23. Upon Habib moving to Milwaukee in approximately December 2016, Habib was identified as having resided at 8XX E. Kilbourn Avenue in Milwaukee. The subscriber for utilities at the Kilbourn Ave. location was Robert Malkin. Habib resided there until February 2017, when he moved to another stash location at 42XX S. Ravinia Dr., #1XX, Greenfield, Wisconsin.

24. Rental documents obtained for 42XX S. Ravinia Dr., #1XX, Greenfield, Wisconsin, located in the same apartment complex as 41XX W. Hillcrest Drive, #2XX, revealed that the Ravinia Dr. location was rented by Robert Malkin in February 2017. For the rental application credit / income fields on the application, Malkin supplied copies of checking account statements of two accounts, both joint accounts in the names Robert Malkin and Sydney Malkin, who is Robert Malkin's daughter. One account mailing address was 2XX W. Ojai Ave, #1XX, Ojai, California, and the other listed an address of 36XX W. Harbor Blvd., #2XX, Ventura, California. The insurance for the apartment rental was under the names Robert Malkin and Sydney Malkin, with an address of 2XX W. Ojai Ave., #1XX, Ojai, California. Robert Malkin paid the monthly rent of $1,130 in money orders for this stash location. The subscriber for utilities at the Ravinia Dr. location was Sydney Malkin.

25. Rental documents obtained for the residence of Josef Habib, 1XX W. Walker Street, Milwaukee showed that the apartment had been rented by Corianne Markowski, the girlfriend of Josef Habib, in April 2017. In the rental application, Markowski listed her

employment since 2012 as Malkin Properties, 36XX W. Harbor Blvd., #2XX, Ventura, California. Robert Malkin was listed as Markowski's supervisor with a contact telephone number of 805-279-5XXX, a number known to be utilized by Robert Malkin. Markowski also listed her previous residence as an address known by law enforcement through database checks as a residence known to be owned by Malkin Properties in West Mifflin, Pennsylvania.

26. Information received from the Wisconsin Department of Workforce Development on Markowski's claimed wages revealed she lived in Wisconsin from 2012 through 2017; not at 67XX Buchannan Avenue, West Mifflin, Pennsylvania, as alleged on her rental application.

27. In January 2018, a confidential informant ("CI") began cooperating in the continuing investigation into the DTO. The CI provided information about the membership, structure, and customs of the interstate marijuana DTO emanating in California. The CI's information has been corroborated by information obtained from various pubic databases, documents obtained during the investigation, asset and ownership records, law enforcement records, physical observations, and review of recorded jail calls. Such information is detailed below. The CI's information has never been found to be false or misleading. The CI has no criminal record and is receiving consideration in connection with a pending drug case from the United States Attorney's Office for his/her cooperation with law enforcement. The CI has also received monetary compensation in the form of covered expenses in exchange for his/her cooperation with law enforcement. For these reasons, I consider the CI to be reliable.

28. The CI stated that an individual named Bob, subsequently identified as Robert Malkin, obtained in excess of 1,000-pound quantities of marijuana in California, which were subsequently transported by semi-tractor trailer to a location in Maryland. Parts of the shipments were then distributed to various locations in the United States, including the Virginia and Washington D.C. areas; Pittsburgh, Pennsylvania; North Carolina; and Milwaukee, Wisconsin. The CI further stated that Robert Malkin operates a property management company and is suspected of laundering drug proceeds through the company by purchasing properties.

29. The semi-tractor trailer shipments of marijuana were off-loaded from hidden compartments in the trailer at a hangar in Hagerstown, Maryland, with quantities then transported for re-packaging and distribution at a stash house in Germantown, Maryland. In November 2017, the CI was recruited to move into and reside at the stash location in Germantown, Maryland, and was responsible for oversight of the shipments of marijuana upon their arrival in Maryland by keeping accurate counts of the weights of marijuana that were shipped to the hangar and processed at the stash house. The CI was also responsible for collecting large quantities of currency from various co-conspirators as payment by the co-conspirators for quantities of marijuana they obtained from the shipments and had subsequently distributed. The money was also processed and packaged at the stash house and kept at a rented storage location in Gaithersburg, Maryland. Upon the semi-tractor trailer being readied for return to California, the quantities of money were then transported to the hangar and secreted in the hidden compartments in the semi-tractor trailer and driven to California.

30. The CI met an individual identified as Lev Reys through a mutual associate, Fredric Birault, both of whom the CI knew to reside in California. Birault had advised the CI that Reys was looking for someone to assist in the organization's interstate marijuana trafficking organization and oversee the marijuana stash and off-load locations in Maryland, and Reys would pay the individual for those duties. Birault stated that he declined the offer as Birault did not wish to move to Maryland. The CI was recruited by Reys for this role, and Reys had advised the CI that a co-conspirator named "Scotty," subsequently identified by law enforcement as Scott Jungwirth, had occupied the Maryland stash house just before the CI. Reys stated that Jungwirth had the same duties as the CI, but Jungwirth no longer occupied the stash house. Jungwirth had a quantity of marijuana shipped or delivered to the stash house. Having the marijuana shipped to the stash house was against the rules of the organization of keeping the location secret from any mailings or knowledge of who occupied the stash house to maintain the integrity of the organizations' use of the location as a stash house.

31. The CI identified Josef Habib as a Milwaukee-based distributor for the group. The CI had obtained large quantities of U.S. currency from Habib, which the CI then transported back to Maryland.

32. The CI identified Lev Reys as a close associate of Robert Malkin. The CI stated Reys' role in the organization was overseeing transportation of the shipments of marijuana from California to Maryland and other locations. The CI stated that Reys has told the CI that Reys' goal is to accumulate numerous properties in the Pittsburgh, Pennsylvania area using marijuana distribution proceeds and then accumulate further wealth through ownership and rental of the properties.

33. The CI identified an individual named Seth, subsequently identified as Seth Jacobs, as a main Maryland / Virginia-based distributor for the organization, who frequented the stash house in Maryland and oversaw a daily worker at the stash house named Ben. The CI stated Ben was responsible for repackaging the marijuana at the stash location for subsequent distribution and packaging of currency for shipment back to California.

34. The CI also identified an individual named Ala / LA subsequently identified as Alae Arbi, and an individual named Nash, subsequently identified as Nahom Hagos, as individuals who frequented the stash house in Germantown, Maryland and obtained multi-pound quantities of marijuana weekly, which Arbi and Hagos sold in the Maryland, Virginia, and Washington D.C. areas.

35. The CI identified the CI's two cellular telephone numbers. The CI also stated that a cellular telephone that the CI had left at the stash house in Maryland had been provided to the CI by Lev Reys in November 2017 as a cellular telephone number for contacting co-conspirators in the organization. The CI had changed cellular telephones due to issues with service.

36. The CI learned of the overall organization and understood the hierarchy of the organization to be Robert Malkin as the head person in charge of the drug distribution operation and the financier and who paid for the marijuana. Jacobs was similar in status to Robert Malkin

in his role as the main distributor / overseer of the VA / MD / D.C. marijuana distribution. Reys was in charge of the transportation of the marijuana from California to Maryland and other locales. Ben worked at the stash house in Germantown, Maryland, where he repackaged the shipments of marijuana and packaging money to be shipped to California. Hagos and Arbi sold quantities of the shipments in the Maryland; Alexandria, Virginia; and Washington, D.C. areas.

37. After the CI moved to the stash house in Germantown, Maryland, just before Thanksgiving 2017, Reys took the CI shopping for house supplies and food at a Wal-Mart near Germantown. A day or two later, Reys and the CI went to CubeSmart in Gaithersburg where Reys and the CI rented an interior storage unit, #4030. Reys had the CI put the rental in the CI's name, and Reys paid for the rental. Reys then purchased a Rigid steel construction bin, and Reys and the CI transported it to the CubeSmart and put it in the storage unit. Reys provided the CI with spare keys for the storage unit lock and two padlocks that Reys put on the construction bin.

38. The storage unit and bin were used for storing of money, prior to it being taken to the hangar and loaded into the semi-trailers for transport to California.

39. Hagos and Arbi were obtaining quantities of marijuana weekly from Jacobs, which the CI believed they sold in the Alexandria and DC areas.

40. Reys and Jacobs told the CI that Jungwirth was an older white male and that Jungwirth had been fired from his role as he had some marijuana delivered to the stash house in Germantown, which was against the rules of never using a person's real name or having anything delivered like that to the stash house. The CI was told that Jungwirth previously drove the Toyota Highlander and it was purchased as the transportation vehicle for Jungwirth, and subsequently provided to the CI, to use for deliveries and pickups etc.

41. A check on the title history of the Toyota Highlander revealed that it had been titled in the name Scoot Jungwirth, 20XX Jewell Ln., Redding, California on August 1, 2017. The vehicle title was then transferred into the name of the CI on November 21, 2017.

42. The CI would retain receipts from the CI's trips, which the CI then provided to Jacobs and Jacobs, who would reimburse the CI with cash.

43. The CI had met Habib only once before Habib's arrest. Jacobs and Reys had directed the CI to fly to Milwaukee. The CI flew to Milwaukee on Southwest Airlines from Baltimore and the CI rented a car, believed to be from Enterprise. The CI was directed to contact and meet with "Joe" and the CI subsequently met Habib by Hamburger Mary's in Milwaukee. Habib delivered money to the CI, and Habib was driving a black car. The CI then drove the money to the stash house in Germantown, Maryland.

44. The CI stated that on the day of Habib's arrest, the CI was directed by Reys to stop at another stash location in Milwaukee, which the CI identified as 79XX N. 107 St., #X, Milwaukee. Reys had given the CI a set of keys for the apartment before the CI left Germantown, Maryland. The CI was directed to take the marijuana from the 107 Street location

and deliver it to Habib, which the CI did. The CI estimated there was approximately 300 pounds of marijuana in the stash house on 107 Street.

45. The CI then took the marijuana to Habib at the 41XX W. Hillcrest Dr. location and Habib took approximately 140 pounds of the marijuana but left the CI with the remaining amount. Habib also put the bags and boxes containing the U.S. currency in the Highlander for the CI to take back to Maryland.

46. The CI did not know what to do with the marijuana as the CI had never driven marijuana which had already been delivered to another city back to the Maryland stash house. The CI attempted to contact Jacobs and Reys via the Telegram app they utilized on their cellphones but neither answered.

47. The CI was in charge of the inventory of the bags in the hanger and upon obtaining quantities, the CI would reseal and renumber the bags with the current accurate count of the bags / pounds. The marijuana was packaged in Mylar bags and vacuum-sealed bags inside black plastic construction bags.

48. The semi-trailers had hidden compartments within them. One contained what appeared to be lumber stacks but the lumber stacks were hollowed out on the inside with the top layer hinged so that the entire compartment could be accessed. The other trailer had a fake movie production set with equipment inside, men's and women's restrooms, generators, etc. If the rear trailer doors were accessed, a large generator was mounted there to deter someone from accessing the remainder of the trailer. The CI explained that in order to get to the front portion, a person had to crawl under the generator and over other equipment. A large steel Rigid construction bin was in the front portion of the trailer. The fake movie production set trailer was normally used for transporting the money from the sales of marijuana to California, hidden within the steel construction bin. The trailer with the fake lumber stacks would contain the marijuana shipped from California.

49. The truck drivers that hauled the trailers allegedly did not know they were transporting marijuana or money, and Reys told the CI that they would never use the same driver more than once.

50. Two locked large steel construction bins in the hangar were used for storage of quantities of marijuana when the trailers were picked up.

51. The CI observed approximately 30 to 40 black plastic construction bags within the fake lumber stacks, and each construction bag normally contained 6 to 8 Mylar bags, each of which generally contained five pounds of marijuana. The CI stated that the shipments from California contained approximately 1,200 to 1,600 pounds per shipment.

52. The CI was present at the hanger on approximately four occasions when semi-trailers were delivered or taken out, and Reys was present on two occasions.

53. The CI went to the hanger on approximately three other separate occasions alone with instructions from Jacobs to bring back to the Maryland stash house five to six contractor bags of marijuana each time.

54. Jacobs told the CI that if the CI was ever arrested while transporting marijuana, they would obtain an attorney for the CI and that the CI should not worry as they had others who had been arrested with larger amounts than what the CI was transporting and they only received probation.

55. "Ben" worked at the stash house daily and would arrive around 11:00 a.m. and stay until the late evening hours. Ben would repackage the quantities of marijuana that the CI was directed to bring to the stash house from the hanger into separate pound packages. Ben would vacuum seal money that was brought to the house by Jacobs, Hagos, Arbi and others. Ben would count the money in the money counter before shrink wrapping it / vacuum sealing it.

56. Arbi would normally come to the stash house with Seth and would run errands for Jacobs. Arbi also did a marijuana delivery service for Seth in the Washington D.C. area which was a business Jacobs and Arbi wanted to establish. Arbi would also come to the stash house at night to smoke marijuana. Arbi delivered to individuals in the Washington D.C. area, and they had a business name on Weed Maps, an app which each of them had installed on their cell phones.

57. On average, Hagos would come to the stash house every few days, sometimes multiple days in a row, and the CI overheard Nash telling Ben that Hagos needed 40 units of something, a few units of something else, which the CI knew to be Hagos obtaining pounds of different strains of marijuana.

58. On January 9, 2018, law enforcement from Montgomery County Sheriff's Department executed a search warrant at the stash house in Germantown, Maryland, based upon the information developed in this investigation. A search of the residence revealed evidence consistent with the information provided by the CI as the location being a stash house for marijuana distribution, which included: thousands of unused vacuum sealed bags, marijuana remnants, a money counter, latex gloves, and the cellular telephone identified by the CI as being at that location and having been provided to the CI by Reys.

59. The CI identified various telephone numbers and usernames of the co-conspirators from an encrypted cellular telephone application called Telegram, which the co-conspirators used to contact one another to avoid detection from law enforcement as it was a cellphone app that enabled telephone numbers to be displayed when calling or texting and had a feature of "secret chat." The CI stated that the usernames that the co-conspirators used in the app were fictitious names that the various co-conspirators had chosen. The CI stated all of the defendants that were known to the CI primarily only used the secret chat and voice calling on the Telegram app and did not use regular texting. The defendants also used regular non app voice calling seldom and most changed cellular telephone numbers frequently, all to avoid detection by law enforcement.

The CI knew of Jacobs carrying three cell phones at a time and Reys having more than the one cellphone that the CI was aware of.

60. The CI identified Birault's residence as 239XX Windward Ln., Valencia, California, and that he lived with his Asian girlfriend who had the last name of Shin.

61. The CI stated that Reys had resided with his mother at 122XX Hartsook St. in Valley Village for a time after being injured in a vehicle accident, but Reys had told the CI that Reys had a residence in Santa Monica, California, with a view of the ocean that Reys was putting a lot of money into.

62. The CI also stated that Reys normally rented minivans and SUVs when he traveled to Maryland and other areas.

63. Law enforcement reviewed the cellular telephone of the CI and the Telegram app on the CI's cellular telephone. The CI identified the following names and telegram app contacts: a name of Joe with a fictitious name of Steven Trace and username @RalfyXXX, Telegram app telephone number 414-888-0XXX as the contact information for Josef Habib; the name Larry Peters and username @LarryPXXXXX, Telegram app telephone number 818-299-0XXX as the contact information for Lev Reys; a name Alle with no telegram telephone number saved as the username for Arbi; a name Ben with a fictitious name of @timwilXXXXX (aka Paul Ramon) with no telephone number saved as Ben; the name Bob with username name BM with no telephone number saved as Robert Malkin; the name Seth with the fictitious username Rick Orozco as the username of Jacobs.

64. Outgoing calls were observed to the Telegram usernames of Reys and Jacobs during the time period after the CI left Habib's 41XX W. Hillcrest Dr. stash location on January 7, 2018.

65. There were also numerous secret chats between the CI and the other referenced user names.

66. Also observed on the CI's cellphone were numerous pictures time stamped December 21, 2017, of notebook pages containing handwritten notations of abbreviated names of marijuana strains with numbers next to the abbreviations. The CI stated that they were pictures taken by the CI that the CI then sent to Reys and Jacobs documenting the pounds of various types of marijuana that was remaining on that date at the hangar after the CI had been directed to go pick up a quantity of marijuana at the hangar and bring it back to the stash house in Germantown, Maryland.

67. During the week of January 8, 2018, an attorney contacted law enforcement and advised that an individual who identified himself by the name of "Seth" had contacted the attorney regarding the CI and inquired as to the attorney representing the CI. The attorney provided the telephone number that "Seth" called from a 707 area code number. The CI stated the CI does not know any other individuals named Seth other than Seth Jacobs. The CI suspected

that Jacobs was the individual that called the attorney as Reys had told the CI in the past that if the CI was ever arrested that the organization would obtain an attorney for the CI.

68. Records received from the property management company for 79XX N. 107 St., #X, Milwaukee revealed that the rental application was in the name Fredric Birault, 239XX Windward Lane, Valencia, California, with application date of September 20, 2017, and rental date starting October 20, 2017. An email address of larryXXXXXXXXXX@gmail.com was provided along with a verification of income letter from a Larry Peterson, telephone number 818-299-0XXX, stating that Birault was employed by Oasis Management, Beverly Hills, California, as a property manager since 2012. The telephone number and email address are known to be used by Reys.

69. On January 9, 2018, law enforcement conducted a consent search provided by the CI at 79XX N. 107 St., #X, Milwaukee and observed that no one was residing in the apartment. Items observed and seized included plug-in air fresheners, a box of rubber gloves, and loose locksets for doors. The air fresheners were the same type as what was observed at the stash house at 41XX Hillcrest Dr., #2XX.

70. A review of a Lev Reys' credit card accounts, including Citibank account statements, revealed that Reys had flown to Milwaukee from Los Angeles on September 19, 2017, and then from Milwaukee to Baltimore, Maryland, on September 22, 2017. Reys then flew from Baltimore, Maryland, to Los Angeles on September 23, 2017.

71. Reys had charges from a Holiday Inn hotel and Home Depot store in the Milwaukee area on November 8 and 9, 2017. Records received from the Holiday Inn showed that Reys rented a room the night of November 8 into November 9, 2017. A review of the transaction receipt from Home Depot from November 9, 2017, showed that Reys had purchased various household cleaning items and supplies including lockset(s), the same type of air fresheners observed at 41XX W. Hillcrest, #2XX, and 79XX N. 107 St., #X, and latex gloves. Surveillance video obtained from the Home Depot also showed Reys making the purchase and driving from the Home Depot in a light colored newer minivan.

72. On January 25, 2018, law enforcement obtained search warrants from the Honorable Magistrate Judge William E. Duffin for the two cellular telephones of Habib, 414-888-1XXX and 571-639-1XXX. A review of the telephones revealed contacts in Telegram with a name entered as Bdigi, telephone number 805-279-5XXX (known to be the telephone number of Robert Malkin) in the Telegram app, and encrypted conversations between that number and Habib's cellular telephone. Additional telegram usernames were Paul Ramon with username @TimwilXXXXX (identified by the CI as the individual Ben) with calls between the two.

73. There were also numerous chats and secret chats between Habib's cellphone and other unidentifiable usernames on the Telegram app. Some of the chats have pictures of notebook pages containing handwritten drug ledgers, including various marijuana strains with numerical amounts and pages containing monetary amounts, including pages titled "Milw.

Inventory" and "D.C. Inventory" with dollar amounts over $1,000,000. Some of these chats were with Paul Ramon.

74. Database checks on the telephone number 805-279-5XXX revealed the telephone number is listed to Robert Malkin. Further records obtained via subpoena related to rental locations and banking and other records showed Robert Malkin using the telephone number 805-279-5XXX.

75. In January 2018, law enforcement traveled to Maryland with the CI and conducted a follow-up consent search at the stash house located in Germantown, Maryland, using the CI's keys. At that time, law enforcement seized additional items, including a crumpled Burke & Herbert Bank ATM debit card receipt dated December 10, 2017, from a branch at 6210 Interparcel Rd., Alexandria, Virginia (from the basement) and a paid parking stub, dated December 20, 2017, from a parking garage in Washington, D.C. (from the garbage).

76. Bank records and parking management company records received via subpoena revealed that the debit card receipt was from a bank account of Alae Arbi and the parking stub receipt was parking paid for using a credit card issued to Nahom Hagos.

77. Records received from Burke and Herbert Bank show that the debit card ATM withdrawal receipt seized from the "stash house" at 152XX Spring Meadows Drive, Germantown, Maryland, is tied to checking account number ending in 4043, in the name of Alae Arbi of 75XX Shirley Hunter Way, Alexandria, Virginia 22315.

78. Records received from Burke and Herbert Bank show that the debit card used for the charge on the parking stub receipt seized from the "stash house" at 152XX Spring Meadows Drive, Germantown, Maryland, is a match to a debit card for a checking account ending in 1403, in the name of Nahom Hagos of 77XX Ousley Place, Alexandria, Virginia 22315.

79. Law enforcement also conducted consent searches at a CubeSmart storage unit in Gaithersburg, Maryland, and a rented warehouse hangar in Hagerstown, Maryland. The CI identified the storage unit as having contained a Rigid steel construction bin purchased by Reys and put in the storage unit for securing currency from the organization's marijuana sales prior to the currency being shipped to California. The CI identified the warehouse hangar as the location where the semi tractor-trailers were brought for off-loading of the shipments of marijuana. The CI stated that the tractor-trailers had hidden compartments built within them, one of which had what appeared to be stacks of lumber and plywood that were actually hollowed out inside to secrete the shipments and another trailer that had a false movie production set that had another Rigid steel construction bin hidden in the front portion of the trailer.

80. Upon searching the storage unit, the special agents observed a Rigid steel construction bin inside the unit, which was padlocked. A set of keys recovered from the stash house in Germantown, Maryland opened the locks on the bin, which was found to be empty.

81. Surveillance video received from CubeSmart showed Reys and the CI entering the storage unit in November 2017 on the day of the initial rental. A few days later, both are observed on video unloading the Rigid steel construction bin from the Toyota Highlander and taking it inside the storage unit.

82. Upon searching the warehouse hangar, a tractor-trailer was observed parked inside and the interior of the trailer contained two false lumber and plywood stacks. The top layer of false lumber was hinged on each stack, which revealed hollowed out compartments, both of which were empty. There were also two additional Rigid steel construction bins in the warehouse hangar.

83. A check on the California license plate on the trailer revealed that the trailer was registered to Fredric Birault, at 239XX Windward Lane, Valencia, California.

84. Rental documents obtained for the stash house in Germantown, Maryland, revealed that the residence was rented by Robert Malkin in July 2017. Rental documents for the warehouse hangar revealed that it was also rented by Robert Malkin in September 2017.

85. The drug trafficking activities involving some of these individuals was traced back to as early as 2007.

86. In law enforcement databases, Reys was found to be named in a Drug Enforcement Administration ("DEA") investigation as a distributor of marijuana for a named marijuana grow operation in California.

87. In 2011, Nahom Hagos was one of 18 individuals charged by the U.S. District Court in Alexandria, Virginia, with conspiracy to distribute marijuana. The individuals were obtaining shipments of marijuana from California and distributing it in that district along with at numerous college campuses in other states. Hagos pleaded guilty and was sentenced to 18 months prison and 3 years supervised release.

88. In 2013 and 2014, the United States Postal Service seized and forfeited parcels being mailed from Robert Malkin to his wife, Susan Malkin, which contained large sums of currency. In 2013, $25,000 was seized, and in 2014, an additional parcel containing over $149,000 in currency was seized. Based on a civil forfeiture complaint filed in U.S. District Court, Central District of California, in July 2014, the 2014 parcel was shipped by Robert Malkin in Clairton, Pennsylvania, to Susan Malkin, to a UPS store in Ventura, California. The telephone number used by Robert Malkin on the 2014 parcel was 805-279-5XXX.

89. In 2016, Jacobs was named in a DEA investigation when Jacobs had $29,950 of suspected drug proceeds seized from him at Dulles airport.

90. Robert Malkin operates Malkin Properties, LLC, and database checks show that Malkin Properties manages and sells properties in the Southern California and Pittsburgh, Pennsylvania areas.

91.  A check through property ownership databases and subpoenaed records showed that Lev Reys had purchased four properties in Pittsburgh, Pennsylvania, in June and July 2015 – three from Robert Malkin and one from his son, Andrew Malkin.

**CitiBank Records**

92.  Records obtained from CitiBank N.A. (CitiBank) for Lev Reys' personal checking account, CitiBank 4331, were analyzed in the course of this investigation and show the following:

   a.  CitiBank 4331 is held in the name of Lev Reys.

   b.  During the years 2015, 2016, and 2017, at least part of six deposits into CitiBank 4331, totaling $16,075, consisted of currency. Since August 2017, currency was only deposited twice into CitiBank 4331. Those two currency deposits totaled $2,400.

   c.  Between December 5, 2015, and December 16, 2017, total money orders deposited into CitiBank 4331 were as follows:
   
   | | | |
   |---|---|---|
   | | 2015 | $ 3,000 |
   | | 2016 | $ 5,600 |
   | | 2017 | $47,015 |
   | | **Total** | **$55,615** |

   d.  The handwriting on nearly all of the money orders was very similar, with a unique back-slant, despite allegedly coming from the following different remitters, which indicates that: (1) Reys himself had purchased the money orders, and (2) the money orders were an attempt to conceal the nature, source, location, ownership, or control of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i):

   | | |
   |---|---|
   | Joseph Baruch (aka: Joseph B or Joey Baruch) | $16,885 |
   | Larry Birkun (an alias used by Reys) | $ 4,000 |
   | Scott Connely | $ 3,000 |
   | Manny Gonzalez | $ 1,000 |
   | JB Hunt | $    700 |
   | Sarah Kamely | $ 4,600 |
   | Anthony Kole | $ 2,000 |
   | Bill Mahr | $ 1,000 |
   | Robert Malcom (Malkin?) | $ 2,880 |
   | **ROBERT (BOB) MALKIN** | **$ 9,800** |
   | Robert Malone | $ 1,000 |
   | Lev Reys | $ 2,000 |
   | Unknown | $ 3,000 |
   | Gennadi (Gene) Veksler | $ 3,750 |
   | **Total** | **$55,615** |

e. The total value of money orders deposited into CitiBank 4331, since August 16, 2017, (during the past year) is $13,215.

f. Direct deposits into CitiBank 4331 show Lev Reys' affiliation with Robert Malkin in that they include what appear to be payroll checks from Malkin Properties, totaling $86,974.47 from July 6, 2015, through September 28, 2017.

g. Check-based deposits also show Lev Reys' affiliation with Robert Malkin, in that they include the following:

   i. Checks from Malkin Properties, LLC's PNC Bank account, totaling $2,845.00 from August 1, 2016, through September 28, 2017, allegedly related to rental security deposits;

   ii. A check from Robert Malkin's Fresno Valley Partners, LLC account at Bank of the West, dated February 23, 2015, in the amount of $1,095, and designated as a "Final Distribution"; and

   iii. A check from the Robert K. Malkin & Associates, Inc.'s account at Bank of the West, dated May 21, 2016, in the amount of $35,000.

h. I submit that there exists probable cause to believe that Reys has deposited drug proceeds, in cash and via money orders that he purchased with drug proceeds, in nominee names, to comingle the drug proceeds with other possibly legitimate property-management funds for the purpose of concealing the nature and source of those drug proceeds.

i. I further submit that all the funds on deposit in the account were "involved in" Reys' concealment money laundering activity in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and that all those funds on account in the CitiBank 4331 account are therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A) and to criminal forfeiture under 18 U.S.C. § 982(a)(1).

93. Records obtained from CitiBank for Lev Reys' business checking account, CitiBank 1793, were analyzed in the course of this investigation and show the following:

   a. Opening documents for CitiBank 1793 show that ROI PROPS JAX, LLC was established on February 21, 2017; that it is a "personal investment company," whose address is 12203 Hartsook Street, Valley Village, California; and that the signer on the account is the business' 100% owner and "Member," Lev Reys.

16

Case 2:18-mj-01293-WED   Filed 08/06/18   Page 17 of 19   Document 1

b. As of December 31, 2017, deposits into CitiBank were as follows:

   i   Three money orders totaling $2,900 deposited on October 17, 2017, allegedly purchased by an "Alice R." These money orders appear to bear the same back-slanted handwriting as the money orders deposited into Lev Reys' personal account, and

   ii  A $47,480.61 transfer on October 17, 2017, from CitiBank 4331.

c. As of December 31, 2017, withdrawals from CitiBank 1793 included the following:

   i   A $42,839.06 wire transfer on December 1, 2017, to an unknown receiver, but presumed to be related to the purchase of the real property located at 152 Parkfield Street, Pittsburgh, Pennsylvania, which was recorded as sold on that same date, and

   ii  Check # 1002 in the amount of $425.99, clearing on December 15, 2017, and made payable to Coldwell Banker.

d. I submit that Reys (1) deposited $2,900 in drug proceeds, in the form of a money order bought in a nominee name, into the account; and (2) transferred drug proceeds and funds involved in money laundering, from his CitiBank 4331 account into this CitiBank 1793 account, at least in part to comingle those drug proceeds and funds involved in prior money laundering activity with presumably "clean" property-management and property-investment funds, to conceal the nature and source of these criminal proceeds.

e. I further submit that there exists probable cause to believe that Reys thereby engaged in concealment money laundering in connection with these funds on deposit in the CitiBank 1793 account, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and that all funds now in the account are therefore subject to civil forfeiture as "involved in" that offense under 18 U.S.C. § 981(a)(1)(A) and to criminal forfeiture under 18 U.S.C. § 982(a)(1).

94. The account balances as of March 31, 2018, for the Lev Reys accounts at CitiBank were as follows:

   a. CitiBank 4331 - $165,860
   b. CitiBank 1793 - $6,563

17

## Conclusion

95. Based on the facts and circumstances set forth in this affidavit, I submit that there exists probable cause to believe that the funds listed below:

    a. Constitute or are derived from proceeds of trafficking in controlled substances, or were used or intended to be used to facilitate the commission of a controlled substances offense, committed in violation of 21 U.S.C. § 841(a)(1), and therefore are:

        i. Subject to civil forfeiture under 21 U.S.C. § 881(a)(6) and 18 U.S.C. §§ 981(a)(1)(C) and 984;

        ii Subject to criminal forfeiture under 21 U.S.C. § 853(a); and

        iii Subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b) and 21 U.S.C. § 881(b), and via a criminal seizure warrant under 21 U.S.C. § 853(f).

    b. Were involved in concealment money laundering transactions committed in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore are:

        i Subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(A);

        ii Subject to criminal forfeiture under 18 U.S.C. § 982(a)(1); and

        iii Subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b) and via a criminal seizure warrant under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

**List of funds in bank accounts sought to be seized:**

    (1) All funds on deposit in CitiBank N.A. account ending in 4331, held in the name of Lev Reys;

    (2) All funds on deposit in the CitiBank N.A. account ending in 1793, held in the name of ROI PROPS JAX, LLC.

###